**E. N., by and through E.N.'s parents and natural guardians, J.H. and G.N., Petitioners**

v.

**M. SCHOOL DISTRICT, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs April 20, 2007.

Decided July 12, 2007.

---

J.H. and G.N., petitioners, pro se.

Sharon W. Montanye, New Britain, for respondent..

BEFORE: COLINS, Judge, and COHN JUBELIRER, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

Petitioners, who are parents (Parents) of a six-year-old child (E.N.) attending first grade at an elementary school within a Commonwealth school district (District)[1],

---

1. E.N.'s parents had petitioned this Court to seal the record in this case so as to protect E.N.'s privacy. This Court issued an order doing so on June 1, 2007. To further protect E.N.'s privacy, we have issued an order modifying the caption of this case by removing a

petition for review of an order of the Special Education Due Process Appeals Panel (Panel), which reversed an order of a Hearing Officer (Officer). The Officer had issued an order reversing the District's determination that E.N. was not eligible for the District's gifted program. Parents, appearing before this Court pro se, ask that the Court: (1) immediately identify E.N. as a gifted student and order a Gifted Individual Education Plan meeting be conducted within ten days of the Order; (2) award compensatory education to E.N. to make up for the individual enrichment E.N. should have been receiving since January 2006, when Parents first requested that E.N. be identified as a gifted student; (3) that the District reimburse Parents for expert witness fees incurred in the amount of $1,487.50; (4) order all District employees involved in gifted screening to receive training on regulatory procedures and gifted assessment; and (5) order that the District identify and develop gifted screening and procedures that are in accord with state regulations within six months of the Order.

In September 2005, E.N. entered the first grade at a District elementary school. At the time, E.N. was five-years-old and had not attended public school kindergarten. In the previous school year, E.N. had attended a private preschool/kindergarten program. In February 2006, pursuant to 22 Pa.Code. § 16.22(b), Parents requested

by letter to the District that the District conduct an evaluation of E.N. to determine if E.N. was eligible for the District's mentally gifted program. In the letter, Parents noted that E.N. had been evaluated the previous year by the Johns Hopkins Center for Talented Youth (CTY), which identified E.N. as being gifted.[2] Additionally, the letter indicated that E.N. had "repeatedly complain[ed] of boredom" and that [E.N.] learns quickly and did not "require repeated exposure to information as many children do." (Letter from Parents to Principal of E.N.'s School (February 7, 2006).)

Although the District psychologist began testing E.N. for the gifted program in February, the testing was not completed until May and, as of May 26, 2006, the written report of the District psychologist, called a Gifted Written Report (School Report), had not been completed.[3] Consequently, Parents filed a request on May 26, 2006 for a Due Process Hearing based on, what they considered to be, the lateness of the School Report. Prior to the Due Process Hearing at the Office for Dispute Resolution, the District provided Parents with the School Report. After reviewing the School Report, Parents amended their Due Process Hearing request to reflect their disagreement with the District psychologist's recommendation.

In the School Report, the District psychologist recommended that E.N. *not* be

---

pronoun identifying E.N.'s gender, and by removing the name of the School District. We have similarly modified references from record citations to eliminate any reference that could identify E.N.'s gender.

2. Although Parents' letter indicated that CTY had found E.N. to be gifted, the actual report from CTY merely states that E.N. should be considered for gifted programs—it does not specifically contain any explicit, unequivocal finding that E.N. was, as of the time of the CTY testing, gifted.

3. The tests and evaluations are to be "[a]dministered by certified school psychologists under instructions provided by the producer of the tests and sound professional practice," 22 Pa.Code § 16.22(g)(3)(iv), and must be "[s]elected and administered so that the test results accurately reflect the student's aptitude, achievement level or whatever other factor the test purports to measure." 22 Pa. Code § 16.22(g)(3)(ii).

placed in the District's gifted program but, rather, that E.N. be reevaluated for giftedness in one year. He also recommended that E.N. be "given the opportunity to pursue enrichment activities if [E.N.] has demonstrated mastery in specific areas of the curriculum." (School Report at 5, R.R. at 207a.) "Mentally gifted" is defined as "[o]utstanding intellectual and creative ability the development of which requires specially designed programs or support services, or both, not ordinarily provided in the regular education program." 22 Pa.Code. § 16.1. The applicable regulations that set forth the means of assessing giftedness provide two prerequisites for finding a student to be "mentally gifted", essentially an objective and a subjective component, and the School Report addressed both components. Under the regulations, a student is considered gifted if: (1) the student "has an IQ of 130 or higher," *and* (2) displays "multiple criteria ... indicat[ing] gifted ability." 22 Pa.Code § 16.21(d). The regulations give examples of such criteria, including:

(1) A year or more above grade achievement level for the normal age group in one or more subjects ...

(2) An observed or measured rate of acquisition/retention of new academic content or skills that reflect gifted ability.

(3) Demonstrated achievement, performance or expertise in one or more academic areas as evidenced by excellence of products, portfolio or research, as well as criterion-referenced team judgment.

(4) Early and measured use of high level thinking skills, academic creativity, leadership skills, intense academic interest areas, communication skills, foreign language aptitude or technology expertise.

(5) Documented, observed, validated or assessed evidence that intervening factors such as English as a second language, learning disability, physical impairment, emotional disability, gender or race bias, or socio/cultural deprivation are masking gifted abilities.

22 Pa.Code § 16.21(e)(1)-(5).

Objectively, the School Report indicated that E.N.'s scores on two IQ tests were at or close to the 130 IQ level. The first IQ test, the Kaufman Brief Intelligence Scale Second Edition (K–BIT-2), yielded an IQ Composite score of 131, with a nonverbal score of 130 and a Verbal Score of 124. The second IQ Test administered to E.N., the Wechsler Intelligence Test for Children–Fourth Edition (WISC–IV), yielded a Full Scale IQ score of 124. In discussing the sub-tests that made up these IQ tests, the School Report indicated that E.N. scored significantly lower on components of the test geared to processing speed.[4] The School Report also indicated that, as part of testing to assess E.N.'s academic achievement, E.N. has been administered the Woodcock Johnson Tests of Achievement–Third (WJ–III) tests. These tests revealed "Superior reading comprehension skills, High Average math reasoning skills[,] Very Superior knowledge of the rules of capitalization and punctuation" and a "High Average" score as to knowledge of science, social studies and culture. (School Report at 3, R.R. at 205a.)

---

4. In discussing the four components of the WISC–IV test that had been administered to E.N., the psychologist noted there was "significant variability" with the results, in that E.N. had "an Average Processing Speed Index of 97," but higher scores in the three other components ("High Average Verbal Comprehension," "Very Superior Perceptual Reasoning" and "Superior Working Memory"). (School Report at 2, R.R. at 204a.)

The School Report also discussed subjective criteria, finding that there were several factors deriving from E.N.'s behavior that suggested against classifying E.N. as gifted. The District psychologist's conclusion and recommendation was that E.N.'s "performance on formal cognitive and academic measures indicates that [E.N.] has highly developed skills in a number of specific areas. Therefore, it is logical that [E.N.] has done well in the first grade curriculum even though by age [E.N.] should be in kindergarten." (School Report at 5, R.R. at 207a.) However, he noted that "there are behavior-emotional indicators that suggest that [E.N.] is struggling to effectively cope with the academic demands that have been placed on [E.N.] and the demands that [E.N.] is placing on—self to excel." (School Report at 5, R.R. at 207a).

The School Report chronicled observations the District psychologist made during his administration of the tests to E.N. that he found significant and that indicated to him that E.N. became distressed as the difficulty of the test items increased:

During the administration of the WISC–IV, [E.N.'s] mood varied with the level of difficulty of the test item. On lower-level items [E.N.] appeared happy, smiling and engaged in voluntary conversation. However as the level of difficulty increased, [E.N.] became quiet and was sometimes reluctant to elaborate on . . . answers. [E.N.] avoided further probing by quickly stating "I don't know" although encouraged to guess. [E.N.] also seemed anxious. [E.N.] intermittently played with the ends of [E.N.'s] hair, avoided eye contact and sighed repeatedly when attempting a challenging task. After about 40 minutes, [E.N.] visibly looked upset when [E.N.] was having difficulty remembering a string of letters and numbers. With a little encouragement, [E.N.] was able to work for another 10 minutes with good concentration. However, [E.N.] again began to look upset [while] solving very complex matrices. [E.N.'s] eyes were full of tears and when asked why [E.N.] was upset, [E.N.] stated that [E.N.] was tired. At that point, the examiner suggested that they take a break and led [E.N.] out of the classroom. [E.N.] got a drink of water and sat with the examiner in the hallway. [E.N.] soon calmed down and responded to the examiner's comments, sharing more information about [E.N.'s] interests. After about 10 minutes, [E.N.] agreed to return to the room and finish the testing. [E.N.] seemed comfortable for the remainder of the testing period.

(School Report at 2, R.R. at 204a). The School Report also noted that E.N.'s "rate of acquisition and retention [of information] is above average compared to [E.N.'s] classmates" and that "[E.N.] exceeded standards in reading, social studies, science, writing and math." (School Report at 4, R.R. at 206a.)

The School Report noted that E.N.'s classroom teacher had stated that E.N. "appears nervous in class" and that E.N. "also sometimes has difficulty interacting with . . . peers" in that E.N. "can be bossy with . . . playmates" and that E.N.'s "comments have offended [the child's] peers." (School Report at 5, R.R. at 207a.) The psychologist stated that "it is imperative that [E.N.] learns how to mediate . . . emotions and express . . . feelings so as not to internalize them" and that E.N. "learn[s] how to communicate more appropriately with . . . peers." (School Report at 5, R.R. at 207a.)

The School Report also summarized an evaluation of E.N. that had been conducted, at the request of Parents, by psychologists from CTY the year prior to E.N. starting 1st grade within the District. As described in the School Report, the CTY Evaluation (CTY Evaluation) found E.N.

to be at the "mid first grade level" and recommended that E.N. be placed in a "rigorous first grade level" when [E.N.] attended school the following year. (School Report at 1, R.R. at 203a.) [5]

After evaluating all the factors using criteria established by the District and compiling it on a Gifted Screening Summary (Summary), the District psychologist concluded that "[a]t this time, however, [E.N.] does not meet the [the] District['s] criteria for gifted programming. [E.N.] earned 20 out of a possible 40 points (A student must earn 80% of the total points or 32 points to be eligible for gifted programming....)." [6]

Based on the Parents' request and amended request, the Office for Dispute

5. The CTY Evaluation, which had been submitted to the District and was also submitted as part of the Hearing, provided that:

> [E.N. i]s a bright child with superior abilities. [E.N.'s] Full Scale IQ score of 122 is superior and indicates excellent cognitive capabilities across many areas. However, [E.N.'s] verbal abilities are more well-developed than [E.N.'s] non-verbal abilities and [E.N.] works at an average pace, so the Full Scale IQ score is misleading. [E.N.'s] verbal reasoning abilities are better than 98 percent of other children [E.N.'s] age, whereas [E.N.'s] nonverbal reasoning abilities are better than 86 percent of [E.N.'s] peers.
> [E.N.'s] achievement is exceptional in all content areas: math, reading, and written language. [E.N.'s] overall performance is stronger than 99.7 percent of other children [E.N.'s] age and more similar to students at least one grade level higher than [E.N.'s] own. [E.N.] clearly needs a stimulating and challenging academic environment. Below are some recommendations to more appropriately challenge [E.N.] and keep [E.N.] engaged in the learning process.
> [E.N.] should **be placed in a rigorous first grade curriculum next year.** [E.N.'s] achievement levels demonstrate [E.N.'s] strong skills in math, reading, and written language.

(Summary and Recommendations, CTY Evaluation at 6, R.R. 176a.) The CTY Evaluation further noted that:

> Although [E.N.] has great academic potential, [E.N.'s] personality and interpersonal style need to be considered in educational planning. [E.N.] can appear shy and reserved at first. [E.N.] may feel some anxiety and show signs of perfectionism. Spe-

cial care needs to be taken to ensure that [E.N.] is comfortable academically, and that the level of challenge does not become overwhelming to [the child].

(Summary and Recommendations, CTY Evaluation at 8, R.R. 178a.) The report also indicated that:

> On many of the tasks, [E.N.] worked slowly and steadily. On timed tasks, [E.N.] was instructed to work as quickly but as accurately as possible.... However, [E.N.] worked somewhat slowly relative to other children [E.N.'s] age. Because of [E.N.'s] lack of testing experience (due to [E.N.'s] age and [prior] academic environment[]), the examiner did try to provide many reminders throughout the timed tasks. For example, [the examiner] would say, "remember to work as quickly as you can." These reminders did not seem to facilitate a faster pace of work, suggesting that [E.N.] was working as fast as [E.N.] could.

(Observations, CTY Evaluation at 2, R.R. 172a.) The report went into detail as to how two of the tests that were used in determining E.N.'s IQ involve "highly speeded tests" for which E.N. had significantly lower scores (although still in the average range) than E.N.'s scores in the other tests that comprise the IQ test that were not speed oriented. The tester indicated that these scores reduced E.N.'s overall IQ score, but that "[g]iven [E.N.'s] young age and inexperience with timed tests, [E.N.] is likely to learn how to work more quickly with experience." (Observations, CTY Evaluation at 4, R.R. at 174a.) A licensed psychologist with CTY opined in a letter that "[E.N.] clearly needs a stimulating and challenging academic environment. Whenever available, [E.N.] should be considered for gifted and talented programs in [E.N.'s] school." (Letter from CTY Psychologist (June 14, 2006), R.R. at 182a.)

6. The Gifted Screening Summary (Summary) included a scoring matrix which provided that:

Resolution sent a notice to Parents and the District setting a hearing for June 21, 2006, and assigning an Officer. Parents and the District engaged in a pre-hearing telephone conference "during which there was general but not total agreement about what must be decided by the ... Officer: eligibility for gifted services, whether the matrix violates [the applicable regulations governing gifted education that are found in Chapter 16 of Title 22 of the Pennsylvania Code], and what remedies should be awarded." (Officer's Decision, Finding of Fact ¶ 6.)

The Hearing Officer conducted four days of hearings at which Parents called seven witnesses [7] and District called three witnesses.[8] On September 9, 2006, the Officer issued her decision and ordered that, within 30 days, the District was to administer an appropriate IQ test to Student, but not the WISC–IV, or was to utilize the scores achieved on the K–BIT–2. In the event that Student scores a full scale IQ of 130 or more on any such test, the School District shall identify student as 'mentally gifted' and promptly schedule a gifted multi-disciplinary team (GMDT) meeting in accordance with 22 Pa.Code. § 16.22(d).

(Order.) [9] The Order also had a contingency in place if E.N. did not score above 130 on the IQ test, directing the District in such an instance to "reconsider Student's eligibility as 'mentally gifted' based upon those criteria set forth in 22 Pa.Code § 16.21(e), without using the [Summary]." (Order.) The Order was based on the following conclusions of law, made by the Officer:

| Criteria for Gifted Programming Eligibility | Maximum Possible Points | Points Earned by Student |
|---|---|---|
| Teacher Recommendation | 5 | 1 |
| Achievement Test Results | 6 | 4 |
| Ability (IQ) Testing | 10 | 10 |
| Classroom Achievement (Grades) | 4 | 4 |
| Screening Subtotal | 25 | 19 |
| Woodcock-Johnson Broad Knowledge Cluster | 5 | 1 |
| Individual Ability Testing (WISC-IV IQ) | 10(+) | 0 |
| Total Points | 40 | 20 |
| Points Required for Eligibility (80% total) | 32 | |

(Summary, R.R. 209a.)

7. Parents' witnesses were: (1) a Psychologist; (2) District's Psychologist; (3) E.N.'s pre-school teacher; (4) E.N.'s first grade teacher; (5) School Administrator; (6) E.N.'s father and (7) E.N.'s mother.

8. The District's witnesses were: (1) Elementary School Principal; (2) the District's former gifted program chairperson who was also the author of the District's grading matrix; and (3) District's Psychologist, on rebuttal.

9. The effect of the Order is to essentially eliminate the subjective criteria for assessing giftedness.

4. The School District failed to follow Chapter 16 when it utilized scores on an IQ test which had not been administered in a way which would allow Student to perform [to the child's] best or to reflect the student's accurate IQ, in violation of 22 Pa.Code. § 16.22(g)(3)(ii).[10]

5. The School District's screening and identification process do not meet the requirements of Chapter 16 because it fails to include proper and balanced evaluation of those criteria set forth in the regulations for identifying gifted ability: achievement levels, rate of acquisition and rate of retention of new academic content or skills, demonstrated achievement, performance or expertise in one or more academic areas, and early skill development. 22 Pa.Code § 16.21, § 16.22(g)(3)(v).

(Officer's Decision, Conclusions of Law ¶¶ 4–5. (footnote added).) Both parties appealed the Officer's Decision by filing exceptions with the Panel.[11] On November 1, 2006, the Panel issued an order vacating conclusions of law 4 and 5 from the Officer's Decision, and reversing the Officer's Order. In doing so, the Panel concluded that E.N. was "not in need of specially designed instruction and, therefore, does not meet the criteria as a student eligible for Chapter 16 gifted services." (Panel

---

**10.** The foundation for this conclusion arose from Parents' argument that the District psychologist improperly administered the WISC–IV test. Parents argue that the District psychologist, by delaying the administration of the test beyond the window of time allowed by the regulations, limited his own ability to reschedule the test such that he continued to administer it under less than appropriate circumstances. The gist of this argument is that districts are required "to complete a gifted multidisciplinary evaluation for a student referred to evaluation within 45 school days after receiving parental permission," 16 Pa. Code § 16.22(j)(1), and to complete an evaluation report no more than 10 days after completing the evaluation. Part of the evaluation involves "an assessment by a certified school psychologist." 16 Pa.Code § 16.21(d). Parents argue, essentially, that when E.N. became distressed, the District psychologist should have rescheduled the administration of the test to a time when E.N. was in a better frame of mind. Parents argue that the test was not rescheduled, because the evaluation was already late, and that the District wanted to rush it along. In response, the District noted that the test had been administered timely because school holidays and times the school was not in session are not included in calculating the time.

**11.** Parents raised four exceptions: (1) Officer should have found E.N. to be gifted immediately and directed that an appropriate Gifted Individualized Education Plan (GIEP) be prepared as soon as possible; (2) the Officer failed to direct the District to change its screening and identification procedures, despite making findings that "the District's screening and identification procedures are not compliant with Chapter 16 and that the District violated a number of Chapter 16 regulations" (Parents' Exceptions to the Hearing Officer's Decision at 8); (3) the Officer should have awarded E.N. compensatory time for the period of January 2006 (which Parents describe as the date "when a GIEP reasonably would have been in place if the district had referred E.N. for a [Gifted Multidisciplinary Evaluation] in September 2005") (Parents' Closing Arguments at 5); and (4) the Officer should have awarded Parents expert witness fees totaling $1,487.50 (Ex. A to Parents' Closing Arguments), and non-attorney's fees for books Parents had purchased that related to the WISC–IV assessment (Ex. B to Parents' Closing Arguments, totaling $99.91) (Parents' Exceptions to Officer's Decision at 1).

The District raised four objections: (1) Officer failed to make any explicit credibility determinations, and failed to properly weigh the testimony provided by the District; (2) Officer impermissibly ruled on whether the District's screening and identification procedures met Chapter 16 requirements; (3) the Officer's order is legally impermissible in that it makes IQ the determinative factor for assessing giftedness; (4) the Officer failed to consider the second component for assessing giftedness, the need for specially designed instruction. (District's Exceptions to Officer's Decision.)

Order.) Additionally, the Panel concluded that "Parents have failed to present convincing testimony and evidence that [E.N.] is in need of specially designed instruction to receive education benefit. As such, the Parents' request for compensatory education, or any monetary reimbursement, is denied." (Panel Order.)[12] The Panel de-

clined to address whether the District's screening and instruments were appropriate because the Panel concluded resolution of the issue was not necessary to resolve the current case.

Parents now petition this Court for review of the Panel's order.[13] On appeal,

12. Section 16.63 of Title 22 of the Pennsylvania Code establishes the procedures for Impartial Due Process hearings arising from a district's determination of whether a child qualifies as gifted. This section requires the Officer to make findings of fact, conclusions of law, and legal discussion, 22 Pa.Code § 16.63(e), and allows for an appeal of an Officer's decision to "a panel of three appellate hearing officers." 22 Pa.Code § 16.63(*l*). In a case such as this, involving eligibility of a child for the gifted program of a district, "[i]t is the Panel, not the hearing officer, [which] is the final arbitrator of fact and the Panel is obligated to make an independent review of the evidence." *York Suburban Sch. Dist. v. S.P.*, 872 A.2d 1285, 1287 (Pa.Cmwlth.2005).

The Panel, here, confuses the procedure as to its function by citing to Federal law, *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520 (3d Cir.1995), instead of Pennsylvania law. The Panel drew the following standard from the case, which involved application of the Federal Individuals with Disabilities Education Act (IDEA): "appeals panels reviewing the fact findings of hearing officers ... should defer to the hearing officer's findings based on credibility judgments unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." (Appeals Review Panel Op. at 5 (quoting *Carlisle Area Sch.*, 62 F.3d at 529).) In contrast, the Officer here correctly identified that "[t]his case is governed by the state regulations pertaining to gifted education. 22 Pa.Code Chapter 16.... Neither the Individuals with Disabilities Education Improvement Act of 2004 [IDEA 2004], 20 U.S.C. § 1415 *et seq.*, nor its predecessor [IDEA 1997] apply to this case." (Hearing Officer Decision, Conclusion of Law ¶ 1.) This Court has repeatedly indicated that IDEA is a federal statute that only applies to special education students and not gifted students, who are instead governed by Pennsylvania law as set forth in Title 22 of Chapter 16 of

the Pennsylvania Code. *Saucon Valley Sch. Dist. v. Robert O.*, 785 A.2d 1069, 1075 n. 10 (Pa.Cmwlth.2001) (stating that "[t]he gifted education regulations were revised and reissued as Chapter 16 in December 2000 to draw a clear distinction between gifted education as required by the state and special education as required by federal law."); *see also, B.C. ex rel J.C. v. Penn Manor Sch. Dist.*, 906 A.2d 642, 646 n. 7 (Pa.Cmwlth.2006). As the Federal law does not apply, the Panel is required to apply our Commonwealth's law.

The mistake appears to be harmless though because the *Carlisle Area Sch.* case essentially concludes that (1) appeals panels have authority to reach their own findings and legal conclusions, and (2) appellate courts "will therefore defer to the appeals panel rather than the hearing officer in most circumstances" because this is consistent with administrate law practice which generally permits a board or agency "to freely accept or reject" an administrative judge's conclusions of law and findings of fact. *Carlisle Area Sch.*, 62 F.3d at 529. While it was incorrect for the Panel to rely upon Federal Authority, it is clear to us that the Panel's actions were nonetheless consistent with our own binding authority. The Panel indicates that it conducted a de novo review and, although it did not set forth specific findings of fact and conclusions of law, Chapter 16 only requires such findings from the initial hearing officer. 22 Pa.Code § 16.63(e). In this case, the Officer did make the requisite findings and conclusions. The Panel is free to accept or reject whatever findings of fact and conclusions of law made by the initial hearing officer that it chooses. In this case, the Panel's decision is sufficiently clear as to what findings it accepted and what it rejected, and is also clear as to the Panel's conclusions and reasoning.

13. This Court's scope of review of an order of the Panel is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether

Parents argue that the Panel erred by: (1) failing to conduct a proper review and failing to rely on substantial evidence; (2) failing to find that the District violated Chapter 16 regulations; and (3) failing to award appropriate remedies, including compensatory education.[14]

Parents argue that the Panel failed to conduct a proper review and failed to rely on substantial evidence. In particular, Parents argue that the Panel did not review the record, consider the evidence, and also that the Panel did not properly weigh the evidence.

The crux of Parents' concerns is that the Panel opinion is not thorough, which apparently stems from the absence of citations to test data from the District's screening and evaluation, and to Parents' testimony. Parents accuse the Panel and the District of failing to consider the parental input, particularly their testimony as to E.N.'s achievements, as well as E.N.'s boredom with school, which they attribute to E.N. not being sufficiently challenged.[15] We discern from Parents' objection and their arguments that they believe the Panel opinion is: (1) not reasoned, in that it fails to expressly set forth what the Panel considered and rejected, and (2) deficient in that it is not supported by substantial evidence.

■ In addressing this argument, we note that the Panel stated that it conducted a de novo review. (Panel Op. at 7.) The term "de novo judicial review" means a "nondeferential review of administrative decision, usually through a review of the administrative record plus any additional evidence the parties present." Black's Law Dictionary 852 (8th ed.2004).[16] However, seemingly at conflict with its statement that it was conducting de novo review, the Panel stated that it was bound to the evidentiary weight and credibility of the Officer. Thus, it seems as though the Panel granted greater deference to the Officer's Decision, a decision largely in favor of Parents, than to which the decision was entitled. Construing the Panel's two statements together, we believe that the Panel did consider the full record that had been developed before the Officer. As noted, it granted deference to the Officer's findings, but focused its discussion on where it differed from the Officer's findings. Although the Panel could have been clearer when it described its review, it

the necessary findings of fact are supported by substantial evidence. *York Suburban,* 872 A.2d at 1287 n. 4.

14. The parties have filed a number of motions that are pending before this Court. The District has filed a Motion to Quash Parents' Reply Brief to District's own Reply Brief on the basis that Parents' reply does not address any new issues raised by District in its brief, but simply restates Parents' positions from their original brief. We deny the District's motion and have, accordingly, considered the Parents' Reply Brief.

Additionally, Parents submitted a letter to the Office of Chief Clerk of the Court asking the clerk to include in the record a due process hearing opinion that was attached to the letter. We have treated the letter as an application for relief. District filed a motion to quash Parents' "supplemental submission." We deny the District's motion to quash, we grant the Parents' application for relief and we have considered the due process hearing decision that was attached to the application for relief.

15. Chapter 16 provides that: "[t]he multidisciplinary evaluation process shall include information from the parents or others who interact with the student on a regular basis...." 22 Pa.Code § 16.22(f).

16. Relatedly, "appeal de novo" is defined as using the record as developed before the hearing examiner, but reviewing "the evidence and law without deference" to the trial court's rulings. Black's Law Dictionary 94 (8th ed.2004).

seems that the Panel conducted a full and appropriate review.[17]

██ Parents also raised an argument regarding the sufficiency of evidence; however, we agree with the Panel that there is substantial evidence to support the Panel's decision. "Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It exists only when upon examination of the whole record, the evidence, including the inferences therefrom, is found to be such that a reasonable man might have reached this decision." *Brady v. Workers' Compensation Appeal Board(Morgan Drive Away, Inc.) v. U.S. Specialty Ins. Co.*, 923 A.2d 529, 533 n. 4 (Pa.Cmwlth.2007).

The results of the District psychologist's evaluation seem consistent with those privately obtained by the Parents from CTY. For example, regarding the results relating to E.N.'s processing speed, Parents' expert evaluator indicated that E.N.'s performance in this regard would get better with time and experience with such testing. The District psychologist's report does not preclude such testing but, in fact, specifically encouraged that E.N. be tested again in the subsequent year. Worth noting is that the CTY Evaluation compared E.N.'s processing speed to children of E.N.'s own age, and not to children at the grade level in which E.N. was enrolled. As noted by the District psychologist in the School Report, E.N. was already accelerated because E.N. was placed in the first

grade, whereas, by age, E.N. would normally have been in kindergarten. From our review of the record, it is clear that the Panel agreed with the District's position in its Exceptions to the Officer's Decision, and in particular:

The ... Officer criticizes the District for not awarding points for the *de facto* grade acceleration carried out by the Parents. Besides the fact that *every single District witness testified that any further grade acceleration or academic pressure placed on this Student would be detrimental,* the question is not whether the Student is innately smart, but whether the Student requires gifted education services. The issue of grade acceleration may demonstrate that the student is intelligent which the District does not dispute. However, as a factor in determining whether [E.N.] demonstrates needs beyond [E.N.'s] first grade peers, the fact that [E.N.] is younger is not significant.

\* \* \* \*

[S]pecifically designed instruction is measured against the curriculum that a student would otherwise receive in the regular education classroom. In this matter, the Parents enrolled their Student in first grade a year in advance of the traditional age. Therefore, the Student's need for gifted services is determined against what [E.N.] will receive in the grade that [E.N.] attends and not against [E.N.] chronological age. [E.N.]

---

17. Although the Panel may have erred in the degree of deference it gave to the Officer's findings, such error was nonetheless harmless in this case because the Panel still found sufficient evidence to support a finding that E.N. is not gifted. As discussed earlier, the case relied on by the Panel as establishing the appropriate level of review, *Carlisle Area Sch.,* itself has a degree of ambiguity—indicating that deference is owed to the hearing examin-er, but then also stating that the reviewing panel may make its own findings. Accordingly, there is a degree of ambiguity as to the amount of deference the Panel gave to the Officer's findings. What is clear, however, is that, to the extent that the Panel erred, it erred in giving too great a deference to the Officer's findings—findings that, by and large, were in favor of Parents' position.

is being enriched and accelerated already by the mere fact that the Parents enrolled [E.N.] a year early. *The Student has demonstrated no evidence that [E.N.] needs enrichment beyond what [E.N.] receives as a de facto accelerated student.*

(District's Exceptions to Officer's Decision at 7, 13 (emphasis added).) It is not this Court's function to reweigh evidence, but simply to ensure that substantial evidence supports the findings and conclusions made. *See, e.g., Supervalu, Inc. v. Workers' Compensation Appeal Board (Bowser),* 755 A.2d 715, 720 (Pa.Cmwlth.2000). In this case, the Panel clearly agreed with the District's position as set forth above. From our review of the record, the Panel's decision is supported by substantial evidence.[18] Absent an error of law, we are bound by it.

**18.** The District's psychologist testified that he had a Masters Degree in School Psychology from Temple and a Ph.D. (Tr. at 164.) He testified that he evaluated 250–300 students for placement in gifted programs, and that 60–70% of those students had been tested at the elementary school level. He also testified that he had been a school psychologist for six years, with an additional six years in the field of education.

In discussing the gifted evaluation process, the psychologist testified that being bright, by itself, was not sufficient for a student to qualify as gifted, but that a student needed "to show a need for specialized instruction to meet the child's needs in their advancement in any concept development that they're working on." (Tr. at 176.) When asked "[h]ow do you tell the difference between a really bright child and a gifted child," he responded that "[y]ou hope to see multi-facets. One method would be a quantitative instrument such as the WISC. The other piece is really looking at [the child] as a whole child in a different light, not only [the child's] academic achievement, but also [the child's] social/emotional development and willingness to take on new challenges." (Tr. at 185.) He further testified that he thought "[E.N.] shows some traits of giftedness, but that [E.N.] did not exceed[] the standards that we have established in our District," and that placing E.N. in a gifted program "would be a detriment to [E.N.]." (Tr. at 185.) He testified that from his own observation, as well as the observations of others, "challenge is something that [E.N.] is reluctant to engage in at times, and that's not a good sign for a young child." (Tr. at 186.) He also testified that he "would rather see [E.N.] continue and show [a thirst] for more knowledge and that [E.N.] needs additional work...." (Tr. at 186.)

There was also testimony from the chairperson of the District's gifted program for twenty years, who testified as to the development of the matrix that was used to evaluate children for the District's gifted program. He testified that the matrix had been refined over time. He indicated that, while he did not actually test children for the gifted program, once they were admitted to the program he prepared the GIEP for each gifted child. When asked if he thought, based on his own experience, E.N. would be eligible for the gifted program, he responded that he did not think E.N. would; he testified that even if the matrix he developed was not utilized here, he did not "see[] the level of creativity that [he] sometimes see[s] in gifted students." (Tr. at 380.) He also indicated that "[t]he other thing that [he was] concerned about is sort of a nervousness about getting into situations where [E.N.] has problems when [the child] is confronted with more difficult material." (Tr. at 381.) He expressed concern that "as the questions became more complex, [E.N.'s] mood changed. And [E.N.] was no longer as responsive as [E.N.] was early on." (Tr. at 381.) He indicated that this concerned him because the gifted program was designed to be "academically rigorous, but not to be just more," and that it was a "fairly high-powered program." (Tr. at 381.)

Parents' own evidence, their testimony notwithstanding, is consistent with these assessments. The CTY Evaluation does not identify E.N. as gifted, but simply suggests that E.N. be considered for the gifted program, and that E.N. be placed in a rigorous first-grade program. As stated previously, of particular note is that the CTY Evaluation expressed similar concerns to those expressed by the District witnesses:

Although [E.N.] has great academic potential, [E.N.'s] personality and interpersonal style need to be considered in educational planning. [E.N.] can appear shy and reserved at first. [E.N.] may feel some anx-

Parents also argue that the Panel erred as a matter of law in not finding that the District violated Chapter 16 regulations. Parents argue that the evaluation the District uses to assess whether a student is gifted does not use data in a statistically proper way and fails to take into account factors that the regulations require the District to consider. Parents cite to a document in the reproduced record, which is only excerpted and not identified, as stating that "[w]hen identification procedures require the use of 'cut scores' and/or formulas that combine scores from a variety of measures into a single score (i.e., an IQ score combined with an achievement score and a performance score from a checklist), we violate sound statistical methods and the data are no longer valid (Frasier, 1997)." (R.R. at 288a.) Parents reference the Officer's discussion that it is difficult to be identified as gifted with a full-scale IQ of 130 on the WISC–IV, and that "even if [E.N.] got every other point possible on the Summary, [E.N.] still would be two points shy of meeting District criteria for giftedness with a full-scale IQ of 124." (Parents' Br. at 37.)

In support of this argument, Parents ask the Court to compare E.N.'s Summary to a sample of a Summary for a student with the same IQ as E.N. (124), who received maximum scores on the other criteria, yet still fell two points short of the total necessary to be found a gifted student.[19]

■ In reviewing this argument we note that, although the regulations set an IQ of 130 as being the minimum score a person must obtain to be considered gifted, the regulations have some flexibility by providing that "[a] person with an IQ score lower than 130 *may* be admitted to gifted programs when other educational criteria in the profile of the person strongly indicate gifted ability." 22 Pa.Code § 16.21(d) (emphasis added). We note that the language in the regulation describing a person with an IQ of less than 130 utilizes the permissive *"may* be admitted to gifted programs," and not the mandatory "shall" or a similar mandatory command. We also note that, under this system, a child who displays multiple criteria of giftedness and has an IQ score of 130 or above is to

iety and show signs of perfectionism. Special care needs to be taken to ensure that [E.N.] is comfortable academically, and *that the level of challenge does not become overwhelming to [E.N.].*
(Summary and Recommendations, CTY Evaluation at 8, R.R. 178a (emphasis added).)
Additionally, while the matrix used does not specifically include a point value for data received from parental input, the testimony clearly showed that parental testimony is and was considered. There was testimony that the District "care[d] very much" about Parents' input because "sometimes you see a tremendous difference between how the teacher perceives the student" and how the parents perceive the student. (Tr. at 373.) There was testimony that parents' evaluations can sometimes point out signs of giftedness that may otherwise be missed. However, there was also testimony that parents' assessments are not assigned a number in the ma-

trix, because parents usually mark their children at the high end on all matters.
The testimony of the District's witnesses alone, if found credible, provides substantial evidence to support the Panel's decision. This is particularly true, given that CTY's Evaluation from Parents supports the District's position. We, thus, find that the Panel's decision is supported by substantial evidence.

19. Review of the form indicates that individuals with IQs in excess of 130 receive 11 points, with an IQ of 130 receive ten points, with each lower IQ point receiving one point less, down to an IQ of 125, which receives 5 points. IQs of less than 124 receive no points. Parents' point seems to be that, under the District's scheme, anyone with an IQ of 124 or less is de facto precluded from the gifted program, whereas the regulations do not set 124 as the floor.

be admitted to the gifted program, whereas it is within the District's discretion to admit a child who displays the same multiple criteria of giftedness but who has an IQ score of less than 130.

Applied to the present case we first note that, as correctly characterized by the Panel, while E.N. has displayed some characteristics of giftedness, E.N. has also displayed some characteristics that suggest against a finding of giftedness. Thus, it is far from clear whether E.N. displays sufficient multiple criteria to be able to be classified as gifted. On that basis alone, whether E.N.'s IQ score is above or below the 130 threshold, the District's decision is consistent with the regulations. Although delineating many requirements and factors to consider, the regulations afford the District discretion in evaluating the multiple criteria of giftedness, particularly when determining whether a student below the 130

IQ level should be admitted into the gifted program. We must apply the law to the facts of the case presented before us, and the facts presented before us do not indicate that E.N.'s IQ has been the determinative factor keeping E.N. from being identified as gifted. Our task is not to delve into possibilities or to render advisory opinions, but to apply the law to the facts presented before us. The Panel has correctly interpreted and applied the law, and we discern no error of law in the Panel's decision as to this issue.[20]

Parents also argue that the Panel erred in not awarding appropriate remedies, including compensatory education. Given that we find no error in the Panel's conclusion that E.N. was not properly classified as gifted, we consequently find no error in the Panel's conclusion that E.N. is not entitled to compensatory education.[21]

20. Parents present a thorough, erudite critique of the methodology in which the IQ testing was conducted and the legitimacy of the test itself in assessing giftedness. Parents also present copies of books that relate to the WISC–IV test. However, even if we assume that their arguments on the WISC–IV test are correct, (an assumption that is far from clear is true), substantial evidence still supports the District's and Panel's conclusion that E.N. does not presently qualify as gifted. Parents exhaustively attack nearly every one of these factors, but resolution of these factors calls for factual determinations that are in the province of the Panel. Resolution of this case does not depend on the means by which the WISC–IV test was administered and, as such, the Panel was correct in indicating that the issue need not be addressed.

Also, we note that throughout their briefs, and even in their supplemental submission, Parents reference authority to which we are not bound as it is from other jurisdictions and does not involve Pennsylvania law. We have, nonetheless, considered the arguments Parents have made as to this law, and have looked at it as persuasive authority in addressing and applying our own Commonwealth's law.

21. Parents also argue that the Panel did not conduct an appropriate review because it placed the burden of proof on Parents to establish that E.N. required specially designed programs or support services. Parents and the District acknowledge that the issue of burden of proof has never been decided in gifted cases. District responds that, at one time, both gifted and disability education hearings were subject to the requirements of Chapter 14 of Title 22 of the Pennsylvania Code and that, under these former requirements, the District generally bore the burden of proof. District contends that, although gifted evaluations were removed from Chapter 14 and placed into Chapter 16, Chapter 16 is silent as to who bears the respective burdens. Because of the absence of statutory or case law establishing the burden of proof, the procedural requirements of Chapter 14 were carried over to Chapter 16 proceedings, resulting in the burden generally being placed on the school districts in gifted proceedings. District maintains that placing this burden on them is not derived from the law but, rather, is more a byproduct of institutional tradition. Given the silence of Chapter 16 as to burden, District contends that general administrative law principles would apply, and would place the burden on the moving party. District also

Given our standard of review, we find no errors of law, or constitutional violations in the case, and we also find that the Panel's decision is supported by substantial evidence. For the foregoing reasons, the order and opinion of the Panel is affirmed.

## ORDER

NOW, July 12, 2007, upon consideration of the Brief for Appellant/Petitioner; upon consideration of the Respondent School District's Reply Brief to Petitioners' Brief; upon consideration of the certified original record and the supplemental record; upon consideration of the Respondent School District's Motion to Quash the Petitioners' Reply to Respondent's Reply Brief; upon consideration of the Answer to Respondent's Motion to Quash the Petitioner's Reply to the Respondent's Reply Brief; upon consideration of the application of Petitioners to have hearing officer decision # 6558/05–06 considered by the Court, and

brief in support of the application; upon consideration of the Respondent School District's Motion to Quash the Petitioners' Supplemental Submission to this Court; upon consideration of the Answer to Respondent's Motion to Quash Petitioner's Motion to Consider Special Education Hearing Officer Decision,

IT IS ORDERED that the order of the Special Education Due Process Appeals Panel in the above-captioned matter is hereby **AFFIRMED.**

IT IS FURTHER ORDERED, that the Respondent School District's Motion to Quash the Petitioners' Reply to Respondent's Reply Brief is **DENIED.**

IT IS FURTHER ORDERED that the Petitioner's Reply Brief to Respondent's Reply Brief is considered for this appeal.

IT IS FURTHER ORDERED that the Respondent School District's Motion to

---

argues that the burdens of Chapter 14 were themselves modified by the United States Supreme Court in *Schaffer v. Weast*, 546 U.S. 49, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005), in which the Supreme Court noted that, as to IDEA proceedings, in the absence of statutory guidance, administrative proceedings should follow general administrative law principles. We note that, in the *Schaffer* case, the Supreme Court specifically limited its analysis to the burden of persuasion, which it characterizes as "which party loses if the evidence is closely balanced," and did not address the burden of production, which it characterizes as "which party bears the obligation to come forward with the evidence at different points in the proceeding." 126 S.Ct. at 533–34.

From our own review, we find that our appellate courts have not specifically identified who bears the burden in gifted proceedings and Chapter 16 is, itself, silent. Given the silence of Chapter 16, general administrative law procedures would apply and would place the initial burden on the moving party. *See generally, Mars Area Sch. Dist. v. Laurie L.*, 827 A.2d 1249, 1255 (Pa.Cmwlth.2003) (an IDEA case in which we noted that "because [student's] mother was the party appealing

the School District's decision to discontinue [student's] special education and she requested the due process hearing before the hearing officer, she had the burden of proving that [student] was entitled to continued special education."). However, once the initial burden is met, the matter is left for the finder of fact to weigh the evidence presented by both sides and decide the case on the weight of the evidence. *Haygood v. Civil Service Commission*, 133 Pa.Cmwlth. 517, 576 A.2d 1184, 1185 (1990). While a fact finder may not ignore overwhelming evidence in favor of a result that is not supported by the evidence, the weight to give to particular items of evidence is within the discretion of the fact finder. *Peak v. Unemployment Compensation Board of Review*, 509 Pa. 267, 272, 501 A.2d 1383, 1386 (1985).

From our review, it seems clear that Parents met their initial burden. Meeting that initial burden is not determinative of the case; however, and in this case, the Panel appropriately relied on the record developed by the Officer to weigh the conflicting evidence, ultimately concluding that the District's case was stronger. As there is substantial evidence to support that decision, we find no error in it.

Quash the Petitioners' Supplemental Submission to this Court is **DENIED.**

IT IS FURTHER ORDERED that the application of the Petitioners to have hearing officer decision # 6558/05–06 considered by the Court is **GRANTED.**

IT IS FURTHER ORDERED that officer decision # 6558/05–06 is considered for this appeal.