A.S. and R.S., individually and on behalf of S.S., and S.S. *in his own right*, Petitioners

v.

OFFICE FOR DISPUTE RESOLUTION (QUAKERTOWN COMMUNITY SCHOOL DISTRICT), Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Nov. 8, 2013.

Decided Jan. 24, 2014.

Angela M. Smith, pro se.

Jonathan P. Riba, New Britain, for respondent Quakertown Community School District.

BEFORE: PELLEGRINI, President Judge, and COHN JUBELIRER, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

A.S. and R.S., individually and on behalf of S.S., and S.S. in his own right (collec-

tively "Parents"), petition, pro se, for review of an Order of a Pennsylvania Special Education Hearing Officer (Hearing Officer) finding that no settlement agreement existed between Parents and the Quakertown Community School District (School District). On appeal, Parents argue that the Hearing Officer erred by finding that no valid settlement agreement existed where the approval of the settlement agreement by the School District's School Board was the result of negligence on the part of the School District and not fraud on the part of Parents. Upon review, we conclude that the Hearing Officer erred by finding that no valid settlement agreement existed in this matter; therefore, we must reverse the Hearing Officer's Order.

The Hearing Officer made the following relevant findings of fact. Parents have an elementary age child, S.S., (Student), who is a resident of the School District and eligible for special education services under the Individuals with Disabilities Education Act[1] (IDEA). (Hearing Officer's Decision at 2, Findings of Fact (FOF) ¶ 1.) In the Spring of 2012, Parents filed a counseled due process complaint which was bifurcated to permit expedited consideration of Parents' contention that the School District failed to provide appropriate extended school year (ESY) services to Student. (FOF ¶ 1 n. 3.) The remaining part of the complaint was assigned Office of Dispute Resolution file # 3209–11–12–AS.[2] (FOF ¶ 1.) Parents and the School District, through their respective counsel at the time,[3] entered into negotiations to resolve the complaint without proceeding to a due process hearing. (FOF ¶¶ 2–4.) The child's mother, Parents' counsel, and the School District's counsel met on September 14, 2012 and discussed settlement terms. (FOF ¶ 4.) The School District's Director of Pupil Services was not present at this meeting. (FOF ¶ 4.) Thereafter, between September 20, 2012 and September 25, 2012, the parties' counsel negotiated, via email, the terms of the settlement agreement. (FOF ¶ 8.)

On October 2, 2012, the School District's counsel emailed Parents' counsel a settlement agreement (Agreement One) for Parents' review. (FOF ¶ 16.) The School

---

1. 20 U.S.C. §§ 1400–1482. Under the IDEA, as implemented by the Pennsylvania Department of Education's regulations, a school district must provide a child with a disability a free appropriate public education based on his or her unique needs. 20 U.S.C. §§ 1400(d)(1)(A), 1412(a)(1); 22 Pa.Code § 14.102; *Big Beaver Falls Area School District v. Jackson,* 150 Pa.Cmwlth. 268, 615 A.2d 910, 911–12 (1992). To satisfy this obligation, a school district is required to develop an individualized education plan (IEP) to address and meet a disabled child's educational needs that results from his or her disabilities. 20 U.S.C. §§ 1401(9), (14), 1414(d); 34 C.F.R. §§ 300.320–300.324; 22 Pa.Code § 14.102; *Big Beaver Falls Area School District,* 615 A.2d at 911–12. If a parent disagrees with his or her child's IEP, the parent may file a due process complaint and request an impartial due process hearing. 20 U.S.C. § 1415(f); 22 Pa.Code § 14.162(b). A school district may also file a due process complaint and request an impartial due process hearing if a parent rejects an IEP. 20 U.S.C. § 1415(f); 22 Pa.Code § 14.162(c). Prior to the due process hearing being held the parties must participate in a resolution session, or waive or agree to end a resolution session. 20 U.S.C. § 1415(f)(1)(B)(i); 22 Pa.Code § 14.162(q). The parties may also agree to participate in a mediation process. 20 U.S.C. § 1415(e), (f).

2. It is unclear from the Hearing Officer's Decision what parts of the complaint remained unresolved.

3. Parents and the School District were no longer represented by these individuals at the time the hearing was held before the Hearing Officer in this matter. As noted, Parents are representing themselves in this appeal, and the School District is being represented by different counsel.

District's counsel requested that Parents' counsel have Parents sign two copies of Agreement One and return the originals to her office. (FOF ¶ 18.) The School District's counsel informed Parents' counsel that the originals would be forwarded to the School District for final approval and execution. (FOF ¶ 18.) A copy of Agreement One was not sent to the School District's Director of Pupil Services. (FOF ¶ 18.)

Parents reviewed Agreement One, identified provisions that they believed had been discussed at the September 14, 2012 meeting that were not included in Agreement One, and also identified provisions in Agreement One that they did not recall being discussed at the meeting. (FOF ¶ 25.) Parents made handwritten changes to their copy of Agreement One. (FOF ¶ 25.) Parents disputed that the terms in Agreement One were the agreed upon terms and believed that the terms were those of the School District's counsel, not Parents' counsel. (FOF ¶ 26.)

On October 3 or 4, 2012, Student's mother contacted Parents' counsel to discuss the changes Parents wanted to make to Agreement One. (FOF ¶ 27.) Student's mother directed Parents' counsel to redraft Agreement One and send it back to Parents for further review. (FOF ¶ 27.) Parents' counsel emailed a revised agreement (Agreement Two) to Parents sometime between October 4 and 7, 2012. (FOF ¶ 28.) Agreement Two was typed in a different font than Agreement One, contained additional provisions than those found in Agreement One, omitted some provisions that had been in Agreement One, and "did not contain the notation 'draft' in the lower left hand corner of the pages as did Agreement One." (FOF ¶ 29.)

Agreement Two also "contained terms that were explicitly rejected by the [School] District during the September 14th meeting and during subsequent negotiations." (FOF ¶ 29.)

Parents reviewed Agreement Two and determined that it conformed with the changes that Student's mother directed Parents' counsel to make to Agreement One. (FOF ¶ 30.) However, Parents did not contact their counsel that they approved Agreement Two. (FOF ¶ 30.) Parents signed Agreement Two on October 8, 2012. (FOF ¶ 31.) On that same date, Student's mother hand-delivered the signed Agreement Two to the building receptionist at the School District's administrative office. (FOF ¶ 32.) Student's mother did not inform the receptionist or notify the School District's Director of Pupil Services that Agreement One, drafted by the School District's counsel, had been revised by Parents' counsel at Parents' request. (FOF ¶¶ 33–34.)

The School District's Director of Pupil Services testified that he was puzzled that Student's mother had dropped off material for him without waiting for him to initial that he had received the material, as she had done in the past.[4] (FOF ¶ 35.) As a result, he checked Agreement Two "to be sure the dollar amount agreed upon was correct, and as the amount was correct he gave the document to the School Board secretary to be put on the Board's agenda" for approval. (FOF ¶ 35.) The Director of Pupil Services did not read Agreement Two in any depth because these types of agreements are usually negotiated and finalized by the School District's counsel. (FOF ¶ 35.) The Director of Pupil Services believed that Agreement Two was

4. "Student's mother's past practice when dropping off material to the [Director of Pupil Services] had been to wait for him to come and initial what she had dropped off." (FOF ¶ 35.)

the agreement that the School District's counsel had negotiated with Parents' counsel and that he had no reason to believe that Parents or their counsel had changed the terms. (FOF ¶¶ 36–37.)

Parents' counsel did not inform the School District's counsel that Parents disagreed with the terms of Agreement One or that his office had drafted Agreement Two. (FOF ¶ 39.) Parents' counsel emailed Parents on October 8, 2012 and asked them to get back to him regarding Agreement Two so that he could forward it to the School District's counsel. (FOF ¶ 40.) Parents' counsel was unaware that Student's mother had already delivered a signed copy of Agreement Two to the School District. (FOF ¶ 41.)

When the School District's counsel learned that Student's mother had delivered signed copies of an agreement to the Director of Pupil Services, she did not request that the Director send a copy to her office. (FOF ¶ 42.) The School District's counsel testified that, although it was not the norm, it was not unusual for parents to deliver agreements to the School District and that she never encountered the situation where the agreement was different than what she expected. (FOF ¶ 42.)

On October 11, 2012, Parents' counsel emailed the School District's counsel requesting a confirmation as to when a written settlement agreement would be concluded. (FOF ¶ 43.) The School District's counsel replied, with a copy to the Director of Pupil Services as follows: "If you are asking when Board approval will occur, that will be at the October 25, 2012 meeting." (FOF ¶ 44.) Parents' counsel then forwarded the School District's counsel's response to Parents with the comment that they would have to wait and see until October 25, 2012. (FOF ¶ 45.)

On either October 10, 2012 or October 11, 2012, Student's mother and the Director of Pupil Services conversed on the telephone, but Student's mother did not directly inform the Director that her counsel had retyped Agreement One and that the terms presented in Agreement Two were different than those contained in Agreement One. (FOF ¶¶ 46–47.) Student's mother informed the Director that the agreement she provided to him was "more in line with what we had discussed." (FOF ¶ 46.)

The School District's Superintendent (Superintendent) presented Agreement Two to the School Board for approval on October 25, 2012 and when she did so, she was unaware that Agreement Two was a revision of Agreement One. (FOF ¶ 49.) The Superintendent's common practice is to rely on counsel to negotiate the terms of an agreement and to draft a settlement agreement for the School Board's approval and execution. (FOF ¶ 49.) The Superintendent is only informed of the essential terms of a settlement agreement. (FOF ¶ 49.) The School Board approved Agreement Two on October 25, 2012, without discussion, the Board President signed Agreement Two without first reading the document "in accordance with the accepted practice and in reliance that the agreement," and Agreement Two was mutually accepted by the parties. (FOF ¶¶ 51–52.) "To preserve Student's privacy, the terms were not read aloud at any time to the Board." (FOF ¶ 51.)

In early November 2012, the Director of Pupil Services sent an executed copy of Agreement Two to Parents. (FOF ¶ 53.) Thereafter, Parents submitted to the School District, for reimbursement, an invoice for certain educational services that were provided for Student. (FOF ¶ 54.) The invoice was for a service that was denied by the School District during the

September 14, 2012 meeting and during negotiations between the parties' counsel. (FOF ¶ 54.) Because he was aware that this service was not agreed upon during negotiations, the Director of Pupil Services contacted Student's mother to discuss the matter. (FOF ¶ 55.) When the Director learned that he and Parents had different understandings of the negotiated terms, the Director contacted the School District's counsel for clarification. (FOF ¶ 55.) At this time, the School District's counsel reviewed the copy of Agreement Two that the Director forwarded to her and discovered that it contained different terms than Agreement One. (FOF ¶ 56.) The School District's counsel then contacted Parents' counsel regarding the discrepancy. (FOF ¶ 56.)

Agreement One represented the School District's final offer to Parents and it stands by the offer presented in Agreement One. (FOF ¶ 57.) Thus, the School District rescinded Agreement Two. (FOF ¶ 59.)

Thereafter, the School District filed a due process complaint with the Pennsylvania Office of Dispute Resolution to determine whether a valid settlement agreement existed between Parents and the School District. Two hearings were held before the Hearing Officer on February 25, 2013 and April 16, 2013. Parents testified on their behalf and submitted documentary evidence. The School District presented the testimony of the Director of Pupil Services, the School Board President, the Superintendent, and its counsel who negotiated and drafted Agreement One. The School District also submitted documentary evidence. By Decision and Order dated May 3, 2013, the Hearing Officer found that neither Agreement One nor Agreement Two was a valid settlement agreement and that no settlement agreement existed between the parties. Parents now petition this Court for review.[5]

Initially, we address the School District's assertion in its brief that Parents' appeal from the May 3, 2013 Order of the Hearing Officer is untimely. The School District, without filing a formal motion to quash, argues in its brief that, in order for Parents' appeal to be timely, they had to appeal no later than June 3, 2013; therefore, Parents' appeal docketed in this Court with an appeal date of June 6, 2013 should be quashed as untimely.[6] In response, Parents assert that because the Hearing Officer issued a corrected Decision to the parties, via email, on May 8, 2013, they had thirty days from May 8th to file a timely appeal; thus, their June 6, 2013 appeal to this Court is timely. Parents attached to their appeal documents filed with this Court a copy of the Hearing Officer's May 8, 2013 email purportedly transmitting a corrected decision. The School District asserts that the corrected decision sent to the parties on May 8, 2013 merely corrected a typographical error; therefore, the appeal period was not extended due to the correction.

▮▮▮ Pursuant to Section 5571(b) of the Judicial Code, an "appeal from a tribunal or other government unit to a court or from a court to an appellate court must be commenced within 30 days after the entry of the order from which the appeal is

---

5. Our scope of review "is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether the necessary findings of fact are supported by substantial evidence." *E.N. v. M. School District*, 928 A.2d 453, 461 n. 13 (Pa.Cmwlth.2007).

6. Notwithstanding the School District's failure to file a formal motion to quash, we will address its argument that Parents' appeal should be quashed due to untimeliness.

taken." 42 Pa.C.S. § 5571(b). Section 5572 of the Judicial Code describes how to determine the "date of entry of the order": "[t]he date of service of an order of a government unit, which shall be the date of mailing if service is by mail, shall be deemed to be the date of entry of the order." 42 Pa.C.S. § 5572. While there is no specific instruction regarding calculation where an order is sent via email, what is important is that the recipient of the order be able to determine the date of entry of the order so as to accurately determine the appeal period. As explained by our Supreme Court:

[W]here the appeal period is triggered by administrative action, the involved administrative agency has a duty to provide to the recipient information essential to calculating the appeal period. *See Schmidt* [*v. Commonwealth*], 495 Pa. [238], 241, 433 A.2d [456], 458 [ (1981) ] (noting that while it was "reasonable" for the legislature to specify the appeal period commenced on the date of mailing, this implied a duty on the part of the Department of Revenue to advise the taxpayer of the date of mailing). Without such information, the recipient has no reliable basis for knowing the number of days remaining in which to file a petition for review. *Id.* ("Knowledge of a decision's mailing date is essential to the taxpayer, and the effort required of the Department to indicate the relevant date on the decision or transmittal letter is negligible; hence, the legislature could only have contemplated that the Department would furnish the information that is crucial to the functioning of" the appeal statute.). Where the agency's notice is defective in this regard, we will not dismiss an appeal for untimeliness. *See id.*

*Julia Ribaudo Senior Services v. Department of Public Welfare*, 600 Pa. 641, 649, 969 A.2d 1184, 1188–89 (2009).

■ Here, there is nothing in the certified record showing the manner in which the Hearing Officer's May 3, 2013 Decision was provided to the parties. The only document in the certified record is a May 3, 2013 Decision and, while it contains the date of the Decision, it does not contain a date as to when it was sent to the parties or whether the Decision was mailed via the United States Postal Service or transmitted by email. We note that, during the February 25, 2013 hearing, the Hearing Officer informed the parties that when she issued a decision it would be sent by email and a copy of the appeal procedures would be included, Hr'g Tr., February 25, 2013, at 13; however, there is nothing in the certified record which confirms when or if she did so. In fact, the certified record does not even contain any documentation indicating that the Hearing Officer emailed a corrected decision to the parties on May 8, 2013, although the parties do not dispute that she did so. Given the lack of documentation in the certified record regarding exactly what was sent to the Parents, how it was sent, or when it was sent, "we will not dismiss an appeal for untimeliness." *Ribaudo*, 600 Pa. at 649, 969 A.2d at 1189.

With respect to the merits of this appeal, Parents present a challenge to the Hearing Officer's authority to determine whether a valid settlement agreement existed between them and the School District. Parents argue that the Hearing Officer, a non-lawyer, was not qualified and did not have the authority to decide contract questions. Accordingly, we must first address the jurisdiction of the Hearing Officer in this matter.[7]

---

**7.** The School District offers no argument on this issue in its brief.

There is no statutory provision in the IDEA, or the Pennsylvania regulations implementing the IDEA, that explicitly addresses a hearing officer's authority to determine whether a valid settlement agreement exists between the parties. Moreover, no Pennsylvania state court has addressed the issue of whether a hearing officer has jurisdiction under the administrative process provided by the IDEA and implemented by Pennsylvania to determine whether a valid settlement agreement exists. The Hearing Officer determined that she had the authority to determine this issue pursuant to a Memorandum Decision and Order issued by the Eastern District of Pennsylvania in *I.K. v. School District of Haverford Township* (E.D.Pa., Civil Action No. 10–4397, filed March 21, 2011) (*I.K. I* ).

*I.K. I* involved an appeal from a hearing officer's decision which denied I.K.'s request to reopen an earlier administrative action that had been dismissed by a different hearing officer because the parties had reached a settlement. The hearing officer determined that it was not within her jurisdiction to determine whether there was an existing settlement agreement. The school district moved to dismiss the appeal for, *inter alia*, failure to exhaust administrative remedies. The Eastern District found, without any detailed reasoning, that

it was within the hearing officer's jurisdiction to determine whether a settlement agreement exists. *I.K. I*, slip op. at 5. Therefore, the Eastern District remanded the matter for the hearing officer to make a determination on the issue of whether a valid settlement agreement existed between the parties. *Id.* On remand, the hearing officer concluded that no settlement agreement existed, and the Eastern District affirmed the hearing officer's legal conclusion that the parties did not enter into a valid settlement agreement because the unsigned agreement lacked consideration. *I.K. v. School District of Haverford Township*, 961 F.Supp.2d 674 (E.D.Pa. 2013) (*I.K. II* ), 961 F.Supp.2d at 680.[8] In *J.K. v. Council Rock School District*, 833 F.Supp.2d 436, 450 (E.D.Pa.2011), the Eastern District also observed that "a hearing officer would not err by finding the existence of a settlement agreement between parents and [a local educational agency] as to a child's pendent placement." [9]

■ Upon review of the administrative process set forth in the IDEA, we agree with the Eastern District that hearing officers have the authority under the IDEA to determine whether a valid settlement agreement exists between the parties. It

**8.** Although the Eastern District in *I.K. II* affirmed that no valid settlement agreement existed, the court found that: (1) the school district had, nevertheless, succeeded on its equitable claim that promissory estoppel made the parent's promises to settle the student's IDEA and discrimination claims enforceable under the augmented record; and (2) the parent was estopped from avoiding her promise to waive and/or release the school district from liability for IDEA and discrimination claims she advanced in her complaint. *Id.*, 961 F.Supp.2d at 685–88.

**9.** We note that we are not asked here to determine whether the Hearing Officer has jurisdiction to *enforce* a settlement agreement

between Parents and the School District. The federal courts have addressed this issue and held that a hearing officer lacks jurisdiction to enforce a settlement agreement. *See J.K.*, 833 F.Supp.2d at 449 (holding that the specific provisions of the IDEA and "the purposes justifying due process hearings suggest that hearing officers lack jurisdiction to enforce settlement agreements—even those produced through mediation and resolution meetings"; however, hearing officers "may acknowledge the existence of such agreements and consider them in determining whether a child has received a free and appropriate public education").

is clear from the provisions of the IDEA and the regulations implementing those provisions in Pennsylvania that an administrative process is in place to afford relief for disputes involving the provision of a fair appropriate public education to an eligible child. 20 U.S.C. § 1415; 22 Pa.Code § 14.162. This administrative process mandates that a complainant must first seek relief from local and/or state educational authorities before seeking relief in court. 20 U.S.C. § 1415(f), (g), (i)(2); *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 82 L.Ed. 638 (1938) (stating that it is a "long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted"). To facilitate an amicable resolution of a dispute, the administrative process mandates that the parties attempt to resolve a due process complaint through a resolution session,[10] which may result in a settlement agreement.[11] 20 U.S.C. § 1415(f); 22 Pa. Code §§ 14.162(q), 14.163; *Smith v. Robinson*, 468 U.S. 992, 1011–12, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984) (noting that use of the administrative process supports "Congress' view that the needs of [eligible] children are best accommodated by having the parents and the local education[al] agency work together to formulate an individualized plan for each [eligible] child's education"), *superseded by statute on other grounds*, Handicapped Children's Protection Act of 1986, Pub.L. No. 99–372, 100 Stat. 796 (1986), *as recognized in Board of Education East Windsor Regional School District v. Diamond*, 808 F.2d 987 (3d Cir.1986). If this resolution process is unsuccessful, an impartial due process hearing is scheduled before a hearing officer.[12] 20 U.S.C. § 1415(f)(1)(B)(ii); 22 Pa.Code § 14.162(q). Thus, this process indicates that the hearing officer has the authority to resolve disputes that arise as to whether the parties were able to reach an amicable resolution, which would necessarily include a determination as to whether a valid settlement agreement exists between the parties. As such, a party who disputes that a valid settlement agreement exists must first exhaust the administrative remedies provided for by the IDEA before seeking judicial relief. This requirement:

allows the educational agency, which presumably has considerably greater expertise in the field of education than does the court, to attempt to resolve the complaint in the first instance. Second, it allows the family of the disabled child to play a role in designing appropriate accommodations. Third, it prevents the unnecessary duplication of judicial review by allowing the administrative agency to develop the factual record prior to review by [a] court.

**10.** As noted previously, the parties may agree to waive the resolution process, or agree to engage in a mediation process. 20 U.S.C. § 1415(e), (f).

**11.** If a resolution is reached to resolve a due process complaint prior to the hearing, the parties are statutorily required to execute a legally binding settlement agreement that is enforceable in any State court of competent jurisdiction or in a United States District Court. 20 U.S.C. § 1415(f)(1)(B)(iii). Any such agreement may be voided by any party within three business days of the execution of the agreement. 20 U.S.C. § 1415(f)(1)(B)(iv).

**12.** The IDEA permits States to prescribe whether its administrative hearing system will be one-tier or two tiers. 20 U.S.C. § 1415(f), (g). Since 2008, Pennsylvania has utilized a one-tier system where a complainant has a right to an impartial due process hearing before a hearing officer, after which an aggrieved party may seek relief in a court of competent jurisdiction. 22 Pa.Code § 14.162(*o*). There is no statutory mandate that a hearing officer must be a lawyer. *J.K.*, 833 F.Supp.2d at 449 n. 8.

*Swope v. Central York School District,* 796 F.Supp.2d 592, 600 n. 2 (M.D.Pa.2011) (citations omitted). Thereafter, a party who is aggrieved by the hearing officer's decision may appeal to a court of competent jurisdiction.[13] 22 Pa.Code § 14.162(*o*).

Accordingly, we conclude that the Hearing Officer in this matter did not err by finding that she had jurisdiction to determine whether a valid settlement agreement exists between Parents and the School District. We now turn to the issue of whether the Hearing Officer's legal conclusion that a valid settlement does not exist between the parties is erroneous.

The Hearing Officer determined that Agreement One was not a valid settlement agreement because Parents did not accept the School District's offer. The Hearing Officer determined further that Agreement Two, which the Hearing Officer characterized as a counter-offer, was not a valid settlement agreement because it did constitute an offer due to the fact that it was not communicated to the School District. The Hearing Officer found that the evidence was persuasive that neither Parents nor their counsel communicated Agreement Two to the School District or its counsel in an intentional and definite manner. The Hearing Officer determined that the School District was not aware that a counter-offer had been made; therefore, it "could not then freely and willingly confer [a]cceptance." (Hearing Officer Decision at 19.)

In support of this appeal, Parents argue as follows. The Hearing Officer erred by finding that Agreement Two was not an offer because a meeting of the minds occurred and there was a mutual manifestation of intent to be bound by the terms of Agreement Two. The Hearing Officer ignored the fact that Agreement Two was signed by both parties and ratified by the School Board. The failure by the School District to read or have Agreement Two reviewed by counsel is no defense; therefore, Agreement Two must be deemed valid.

In response, the School District asserts the following arguments. First, despite the fact that a written and executed settlement agreement exists, the credible testimony clearly shows that there was no agreement of the essential terms of the settlement by the parties' counsel and, therefore, there was no meeting of the minds. Agreement Two was not communicated in the manner necessary to constitute an offer and, without any notice that Agreement Two was not the same as Agreement One, the School Board, its Superintendent and its Director of Pupil Services aptly believed that Agreement Two had been negotiated and approved by its counsel. The School District unknowingly executed a document that was unilaterally altered by Parents' counsel, and the underlying facts show that Parents fraudulently induced the School District to execute Agreement Two. Parents knew the School District had not agreed to the material terms set forth in Agreement Two when it presented the agreement to the School District.

 "It is axiomatic that, to form a contract, there must be an offer, acceptance, and consideration." *Reed v. Pittsburgh Board of Public Education,* 862 A.2d 131, 134 (Pa.Cmwlth.2004). "An offer is a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude

**13.** To decide otherwise would result in piecemeal litigation resulting in an undue delay in providing an eligible student with a free ap-

propriate public education as mandated by the IDEA.

it." *Cobaugh v. Klick–Lewis, Inc.*, 385 Pa.Super. 587, 561 A.2d 1248, 1249 (1989) (citing Restatement (Second) of Contracts § 24; 8 P.L.E. Contracts § 23.) As explained by our Supreme Court:

> It is basic contract law that one cannot suppose, believe, suspect, imagine or hope that an offer has been made. An offer must be intentional, definite, in its terms and communicated, otherwise the minds cannot meet. Nor can one be bound because they are contemplating making an offer, or that they would or should have or that someday they might. An offer must define its terms, specify the thing offered and be an intention of the present or the future to be bound.

*Morosetti v. Louisiana Land and Exploration Company*, 522 Pa. 492, 494–95, 564 A.2d 151, 152 (1989) (footnotes omitted). A party wishing to invalidate a contract must "show fraud or mutual mistake by clear, precise and convincing evidence." *Holt v. Department of Public Welfare*, 678 A.2d 421, 423 (Pa.Cmwlth.1996). A mutual mistake exists if, at the time a contract is executed, both parties thereto are mistaken as to the existing facts. *Id.* However, if a mistake is unilateral, there is no basis for rescinding a contract if the unilateral mistake "is not due to the fault of the party not mistaken but rather to the negligence of the party who acted under the mistake." *Id.*

First we note that, in reaching her decision, the Hearing Officer found all the witnesses generally credible, and based upon this credible testimony, the Hearing Officer rejected both Parents and the School District's allegations that Parents, Parents' counsel and the School District's counsel engaged in fraudulent behavior. Instead, the Hearing Officer determined that there was "a more parsimonious explanation for why the situation developed as it did" and concluded that, "[g]iving all participants' actions the benefit of the most benign interpretation, this case represents a perfect storm of unreliable assumptions." (Hearing Officer Decision at 13.) Because it is within the province of the Hearing Officer to make credibility determinations and weigh the evidence in order to make the required findings of fact, *see* 22 Pa.Code § 14.162(f) (requiring that a Hearing Officer's decision contain findings of fact, discussion, and conclusions of law); *E.N. v. M. School District*, 928 A.2d 453, 466 n. 21 (Pa.Cmwlth.2007) (stating that the weight given to the evidence presented at a special education hearing is in the fact finder's discretion and "[i]t is not this Court's function to reweigh the evidence"), and the Hearing Officer's findings are not in dispute, we must uphold the Hearing Officer's determination and conclusion that Parents and the School District did not engage in fraudulent behavior in this matter.

■ However, based upon the Hearing Officer's findings of fact in this matter, her legal conclusion that Agreement Two is not a valid settlement agreement was error. The findings show that Parents, after reviewing Agreement One, requested that their counsel draft Agreement Two with the terms they believed were agreed upon during the negotiations between the parties' counsel at the September 14, 2012 meeting. (FOF ¶ 27.) Parents' counsel complied with Parents' request and provided a draft of Agreement Two to Parents for their review. (FOF ¶ 28.) When Parents determined that Agreement Two was in line with what they believed was negotiated, Parents signed it and Student's mother delivered Agreement Two to the School District. (FOF ¶¶ 30–32.) Therefore, Agreement Two contained definite terms of the thing being offered and Parents intended to be bound by those terms. The School District believes that Agree-

ment Two does not constitute an offer because the manner in which the Agreement was communicated to the School District caused it to unknowingly execute an agreement that it believed contained different terms. Thus, the School District contends, there was no meeting of the minds. However, the findings of fact show that the School District's belief resulted from its decision not to review Agreement Two or question the circumstances of its delivery; had the School District or its counsel done so, they would have been aware that Agreement Two contained terms different from those found in Agreement One.

Although the School District's Director of Pupil Services was puzzled by the manner of delivery of Agreement Two based on past practice, he only skimmed Agreement Two to make sure the dollar amounts were correct. (FOF ¶ 35.) The School District's counsel did not request that the Director send her the agreement delivered by Student's mother even though it was not the norm for a parent to deliver an agreement directly to the School District; thus, the School District's counsel did not read Agreement Two. (FOF ¶ 42.) The Superintendent neither read Agreement Two because she always relied upon counsel and pupil services to inform her as to what the terms of an agreement are, nor did the School Board President read Agreement Two when it was presented for his signature because he also relies upon counsel to negotiate such agreements. (FOF ¶¶ 49–52.) In other words, despite the Director of Pupil Services and the School District's counsel questioning the manner in which Agreement Two was delivered to the School District, no effort was made to ensure that the settlement agreement with Parents contained the terms initially offered to Parents in Agreement One. There was no mutual mistake: there was a unilateral mistake by the School District that resulted in the agreement being approved and executed by the School Board. Given the factual findings, there is no basis to attempt to rescind Agreement Two and the School District is bound by it. *See Holt,* 678 A.2d at 423 (stating that "[i]n the absence of fraud, failure to read a contract before signing it is not a defense and cannot justify a nullification of the contract or any of its provisions").

For the foregoing reasons, Agreement Two is a valid settlement agreement. Accordingly, the Hearing Officer erred by concluding that a valid settlement agreement does not exist between the parties. Therefore, the Hearing Officer's Order is reversed.

### ORDER

**NOW,** January 24, 2014, the Order of the Pennsylvania Special Education Hearing Officer entered in the above-captioned matter is hereby **REVERSED.**

DISSENTING OPINION BY President Judge PELLEGRINI.

I respectfully dissent because I agree with the Hearing Officer that Agreement Two should be rescinded because it was the result of a mutual mistake.

After the School District's Counsel and the Parents' Counsel believed that they had arrived at a settlement of what special education services the District would provide to the Parents' son, S.S., the School District's Counsel sent Agreement One to the Parents' Counsel. Parents informed their counsel that the agreement was unacceptable. No one informed the School District's Counsel that Agreement One, which she believed resolved the matter, was rejected.

The Parents' Counsel then prepared Agreement Two and sent it to the Parents.

Unlike what happened in the past, neither the Parents nor their counsel referred Agreement Two to the School District's Counsel, but instead Parents, unbeknownst to even their counsel, signed the agreement and the Student's mother took it to the School District and left it with a receptionist at the School District's Administrative Office. Everyone at the School District, including the School District's Counsel, assumed that Agreement Two was really Agreement One and it was approved by the School Board and duly executed. Upon realizing the mistake, the School District sought rescission through the Pennsylvania Office of Dispute Resolution which assigned a Hearing Officer who found that there was no meeting of the minds and rescinded Agreement Two.

Reversing the Hearing Officer, the majority denies rescission of Agreement Two because the mistake was unilateral and the Hearing Officer did not find that the mistake was the result of fraud or bad faith on the Parents' part. I disagree with the majority because the Hearing Officer found, without saying so, that there was a mutual mistake on the part of both parties as to what had been agreed to by both parties.

> The doctrine of mutual mistake of fact serves as a defense to the formation of a contract and occurs when the parties to the contract have an erroneous belief as to a basic assumption of the contract at the time of formation which will have a material effect on the agreed exchange as to either party. A mutual mistake occurs when the written instrument fails to set forth the true agreement of the parties. The language on the instrument should be interpreted in the light of subject matter, the apparent object or purpose of the parties, and the conditions existing when it was executed. [*Hart v. Arnold*, 884 A.2d 316, 333 (Pa.Super.2005), *appeal denied,*

587 Pa. 695, 897 A.2d 458 (2006) ] (citations and quotations omitted). If a contract is entered into under a mutual misconception regarding an essential fact, the contract may be reformed if "(1) the misconception entered into the contemplation of both parties as a condition of assent, and (2) the parties can be placed in their former position regarding the subject matter of the contract." *Id.* (citing *Gocek v. Gocek*, [612 A.2d 1004, 1006 (Pa.Super.1992) ] ). We further note that "to justify reformation of a contract on the basis of mutual mistake, evidence of the mistake must be clear and convincing." *Jones v. Prudential Prop. & Cas. Ins. Co.*, 856 A.2d 838, 844 (Pa.Super.2004), [*appeal denied,* 583 Pa. 673, 876 A.2d 396 (2005) ].

*Voracek v. Crown Castle USA, Inc.* 907 A.2d 1105, 1108 (Pa.Super.2006), *appeal denied,* 591 Pa. 716, 919 A.2d 958 (2007).

Without saying so, this was the basis on which the Hearing Officer found that Agreement Two should be rescinded. In her "Discussion and Conclusions of Law" she reasoned:

> Agreement One: When the attorneys representing the parties believed they had concluded their negotiations, in the words of the District's former counsel, that they had a "deal", they moved to the next step, reducing the settlement to writing. Agreement One, drafted by the District's former attorney, represented the Offer, the first essential element of a contract.

> Acceptance may be explicit or implicit. While not all terms need be expressed in an Offer or the Acceptance, the contract must be clear enough so that a reasonable person would understand what they were agreeing to. Upon reviewing the Offer, the Parents did not confer Acceptance as they disagreed with some of the

terms contained in the Offer and identified other terms they wanted included that were not.

Agreement One was an Offer from the District without Acceptance from the Parents. Therefore Agreement One was not a valid settlement agreement, a contract.

Agreement Two: Rather than give Acceptance, the Parents and their former counsel produced a counter-offer in the form of Agreement Two. However, a fundamental principle of contract law is that the party proposing the Offer [in this case the Parents proposing a counter-offer] cannot suppose, believe, suspect, imagine or hope that an Offer has been made. An Offer must be communicated to the offeree [at this juncture the District] in an intentional [and] definite manner. The evidence is persuasive that neither the Parents nor the Parents' former counsel communicated the counter-offer to the District and/or the District's former counsel in an intentional and definite manner. In Pennsylvania, if the party seeking to prove the existence of a contract does not show that a distinct Offer was made, then there is no contract. The District was not aware that a counter-Offer had been made, and could not then freely and willingly confer Acceptance.

Agreement Two was neither a distinct Offer as it was not communicated in an intentional and definite manner, nor was there or could there be Acceptance, as the District did not understand what it was being asked to agree to. Therefore, Agreement Two was not a valid settlement agreement, a contract.

Conclusion: The District's written proposal of the terms negotiated by counsel for the parties [Agreement One] is not a contract without the Parents' Acceptance. The Parents' revised proposal of

terms [Agreement Two] is not a contract without their making it an Offer in an intentional and definite manner. Once the Parents' proposal was eventually made clear, without the District's Acceptance, there is no contract. Moreover, case law in the Eastern District of Pennsylvania has clearly established that where offers have been made but rejected, or believed agreements repudiated, then there is no contract to enforce. Neither Agreement One nor Agreement Two is a valid settlement agreement. (Footnotes omitted)

(Hearing Officer's 5/3/13 Decision at 18–19). Essentially, what the Hearing Officer found is that the School District believed that it had settled the matter on Agreement One, the Parents believed that they had settled the matter on Agreement Two, which means that there was a mutual mistake on the part of both parties thereby justifying rescission.

Accordingly, I would affirm the Order of the Hearing Officer.